# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Board of Trustees of the Construction Industry and Laborers Joint Pension Trust, et al., <br><br>        Plaintiffs <br><br> v. <br><br> Sentinel Maintenance of Las Vegas, LLC, et al., <br><br>        Defendants | Case No.: 2:23-cv-01633-JAD-NJK <br><br> **Order Granting Plaintiffs' Motion for Summary Judgment** <br><br> [ECF No. 42] |

The Construction Industry and Laborers Joint Pension Trust and the board of trustees of that trust sue Sentinel Maintenance of Las Vegas, LLC, SMI, LLC, Sentinel 1, LLC, and Sentinel 2, LLC under the Employment Retirement Income Security Act of 1974 and the Multiemployer Pension Plan Amendments Act of 1980. This conflict originated when Christopher Greco and Marc Schultz purchased the assets of two window-washing businesses— one union, one non-union. Greco and Schultz continued to operate one union and one non-union window-washing business in the Las Vegas area, even adopting the names of the original businesses: Sentinel Maintenance of Las Vegas and SMI. About three years later, the Trust began seeking payment of withdrawal liability from the now-defunct union company that Greco and Schultz had acquired. Having unsuccessfully demanded payment from the original union business, the Trust now moves for a summary-judgment finding that the new entities are on the hook for that withdrawal liability under a successor-liability theory. Because there is no genuine dispute that the old SMI had withdrawal liability and that the new entities are subject to successor liability for it, I grant the Trust's motion for summary judgment.

**Background**

In the summer of 2019, Marc Schultz and Christopher Greco purchased the assets of two businesses from Craig and Joel Grotzky: SMI, LLC and Sentinel Maintenance of Las Vegas LLC.[1]  SMI was a signatory to a collective-bargaining agreement (CBA) with the Laborers International Union of North America Local No. 872, but Sentinel Maintenance was not.[2]  This sale included naming rights, so the names of the original businesses were changed to Sentinel 1, LLC and Sentinel 2, LLC for purposes of the transaction.[3]

The acquired businesses had provided window-washing and construction-cleaning services in Las Vegas.[4]  Schultz and Greco continued to operate one union and one non-union window-washing business in Las Vegas, even adopting the names of the acquired businesses. They formed the new SMI on June 1, 2019, and formed the new Sentinel Maintenance less than a week later.[5]  These new entities performed similar work in Las Vegas and shared customers with the old ones.[6]  They also continued to make contributions and submit remittance reports to the union, many tendered by the same office manager who had submitted remittance reports for the old SMI.[7]

---

[1] ECF No. 42-11 (SMI asset-purchase agreement), ECF No. 42-12 (Sentinel Maintenance asset-purchase agreement).

[2] ECF No. 42-5 at 53:13–54:11 (Grotzky deposition); ECF No. 42-6 (memorandum agreement between SMI and the union).  I cite to CM/ECF pagination for all exhibits.

[3] ECF No. 42-11 at 2; ECF No. 42-12 at 2.

[4] ECF No. 42-13 at 35:20–36:1 (Sept. 17, 2024, deposition of Greco); ECF No. 42-8 at 24:1–12.

[5] ECF No. 42-10 at 5 (Sentinel Maintenance response to interrogatories).

[6] ECF No. 42-8 at 71:11–14; 71:24–72:14 (Limor Caspi deposition).

[7] *See* ECF No. 42-20 (New Sentinel remittance reports); ECF No. 42-21 (New Sentinel contribution checks).

The new entities shared ownership and performed similar work.[8]  Although Sentinel Maintenance was (like its predecessor) used for non-union work while SMI only did jobs covered by the union's CBA, all employee payroll was done by Sentinel Maintenance alone.[9] According to Schultz, the new SMI performed only two "covered jobs" and remitted contribution to the union trust funds for both.[10]  Around February 2020, the Tutor Perini Corporation reached out to the new SMI about a window-cleaning job at the Encore Resort on the Las Vegas Strip.[11] Schultz avers that the new SMI used workers sent by the union hall to complete the job and insists that those workers were paid through the new Sentinel Maintenance only because the new SMI did not have a payroll system and there wasn't enough time to create a new one.[12]  He adds that Sentinel Maintenance paid contributions for that job "on behalf of SMI" because the new SMI didn't have cash available.[13]  The new entities later did a second covered window-cleaning job at the Circa Resort & Casino at the request of McCarthy Construction.[14]

About three years after the new entities were formed, the Trust sent a letter addressed to the new Sentinel Maintenance, declaring that the old SMI had withdrawn from the Trust and owed $842,888 in withdrawal liability.[15]  Jason Gerken, who identified himself as counsel for

---

[8] ECF No. 42-15 at 2–3 (Limor Caspi email sent on Mar. 3, 2021).

[9] *Id.* at 3.

[10] ECF No. 58-3 at 5, ¶ 14 (Schultz declaration).

[11] *Id.* at ¶ 16.

[12] *Id.* at ¶ 17.

[13] ECF No. 58-3 at 5–6, ¶ 18.

[14] ECF No. 42-18 (McCarthy subcontract) (identifying "Sentinel Maintenance of Las Vegas, LLC" and "McCarthy Building Companies, Inc." as parties to the agreement); ECF No. 58-3 at 6, ¶¶ 21–22 (stating that SMI worked with the union to get Sentinel Maintenance employees initiated for the Circa job).

[15] ECF No. 63-2 at 3 (Aug. 26, 2022, letter from the Trust to Sentinel Maintenance).

both of the new entities, responded with an email denying that his clients had any liability for "the prior entities' alleged withdrawal."[16]  Then, on October 6, 2022, counsel for the Trust sent a letter addressed to Sentinel 1 (the old Sentinel Maintenance) and Sentinel 2 (the old SMI) announcing that the old SMI had withdrawn from the Trust in 2019 and thus owed $842,888.[17] This withdrawal-liability notice letter appended documents to illustrate the Trust's liability calculations and set a payment schedule with the first payment due by November 1, 2022.[18]  But the old SMI did not make a payment, request review of the Trust's liability assessment, or initiate arbitration.[19]  Nor did it respond to the notice of default sent by the Trust in February 2023.[20]

Another judge in this district has already found that the new Sentinel Maintenance "evidenced intent" to be bound by the union's master labor agreement (MLA), and that the new entities are alter egos and are bound by the single-employer theory of liability.[21]  The judge declined to decide "whether Sentinel Maintenance had an express obligation to contribute to the employees' health and pension benefits pursuant to the MLA."[22]  The Trust now sues Sentinel 1, Sentinel 2, the new Sentinel Maintenance, and the new SMI, seeking judgment that the old entities are subject to withdrawal liability and that the new ones are subject to successor liability for it.[23]  The old entities brought a crossclaim against the new entities seeking equitable and

---

[16] *Id.* at 2 (Sept. 15, 2022, email from Jason Gerken to Christopher Humes).

[17] ECF No. 42-22 (Oct. 6, 2022, letter from Christopher Humes to Sentinel 1 and Sentinel 2).

[18] *See id.*

[19] ECF No. 42-23 at 2, ¶ 4 (Humes declaration).

[20] ECF No. 42-24 (notice of default); ECF No. 42-23 at 2, ¶¶ 5–7.

[21] ECF No. 42-19 (summary-judgment order issued in Case 2:22-cv-00565-JCM-NJK).

[22] *Id.* at 8.

[23] ECF No. 4.

1  contractual indemnity; the new entities countered with their own crossclaims for declaratory

2  relief against the old entities.[24]  The Clerk of Court has entered default against the old entities.[25]

3        The Trust now seeks to recover from the new entities for the old SMI's withdrawal

4  liability,[26] so it moves for summary judgment on its successor-liability claim against the new

5  entities.[27]  It seeks an award of $1,329,105.14 from the new entities based on its calculation of

6  withdrawal liability, interest, and liquidated damages.[28]  The new entities oppose the motion.[29]

7                                        **Discussion**

8        Summary judgment is appropriate when the pleadings and admissible evidence "show

9  that there is no genuine issue as to any material fact and that the movant is entitled to judgment

10 as a matter of law."[30]  When the moving party bears the burden of proof at trial "it must come

11 forward with evidence [that] would entitle it to a directed verdict if the evidence went

12 uncontroverted at trial."[31]  The plaintiff must establish "beyond controversy every essential

13 element of its" claim in order to avoid trial and prevail on summary judgment.[32]  And the court

14 must view all facts and draw all inferences in the light most favorable to the nonmoving party.[33]

15

16 ───────────────

   [24] ECF No. 17; ECF No. 26.

17 [25] ECF No. 41.

   [26] ECF No. 42 at 4.

18 [27] *Id.* at 5, 26.

19 [28] *Id.* at 24–26.

20 [29] ECF No. 58.

   [30] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

21 [31] *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)

22 (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir.1992) (citation and quotations
   omitted)).

23 [32] *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

   [33] *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

                                          5

**A.    The old SMI is subject to withdrawal liability.**

The first step in determining whether the new entities are liable for the old entities' withdrawal liability is to ascertain whether the old SMI, the former union business, is subject to withdrawal liability.  The new entities don't meaningfully address this issue in their opposition.[34]

One of the "principal purposes" of the Employment Retirement Income Security Act (ERISA) is to "ensure that employees and their beneficiaries [are] not [] deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans."[35]  The Multiemployer Pension Plan Amendment Act (MPPAA) revised ERISA with the purpose of "minimizing the adverse consequences that resulted when individual employers terminated their participation in, or withdrew from, multiemployer plans."[36]  To do so, it provides that employers who completely or partially withdraw from a multiemployer plan must pay withdrawal liability.[37]

29 U.S.C. § 1399(b)(1) requires that a plan sponsor notify a withdrawing employer of the liability amount, the schedule for liability payments, and demand payment per that schedule "as soon as practicable" after that employer completely or partially withdraws.[38]  A withdrawing employer can "ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments," identify inaccurate information that was used to determine the amount of the liability, and supply additional relevant information no later

---

[34] See ECF No. 58 at 2, 10 (stating that Old Sentinel is "clearly" liable and acknowledging "Old SMI's failure to object to withdrawal").

[35] *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984).

[36] *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Haw. Pension Plan*, 891 F.3d 839, 842 (9th Cir. 2018) (cleaned up).

[37] 29 U.S.C. § 1381(a).

[38] 29 U.S.C. § 1399(b)(1).

than 90 days after it receives notice of its withdrawal liability.[39]  Either the plan sponsor or the employer can initiate arbitration within 60 days of the date the employer was notified or 120 days after the employer requested review—whichever is sooner.[40]

The express terms of § 1401(a)(1) require that "*any* dispute over withdrawal liability as determined under the enumerated statutory provisions *shall* be arbitrated."[41]  And the MPPAA provides that "[i]f no arbitration proceeding has been initiated . . . the amounts demanded by the plan sponsor under [§] 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor.  The plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection."[42]

The Trust's October 6, 2022, letter informed the old SMI that it was subject to withdrawal liability in the amount of $842,888, set a payment schedule, and demanded a first payment by November 1, 2022.[43]  This put the old SMI on notice of its withdrawal liability as required by § 1399(b)(1).  No party offers evidence (or even suggests) that the old entities requested review or initiated arbitration and the statutory deadline for such defensive measures has long since passed.  So with the statutory deadlines to contest liability elapsed, and no evidence in the record showing otherwise, the old SMI is subject to withdrawal liability as a matter of law.

---

[39] 29 U.S.C. § 1399(b)(2).

[40] 29 U.S.C. § 1401(a)(1).

[41] *Teamsters Pension Tr. Fund-Bd. Of Trs. of W. Conf. v. Allyn Transp. Co.*, 832 F.2d 502, 504 (9th Cir. 1987) (cleaned up).

[42] 29 U.S.C. § 1401(b)(1).

[43] ECF No. 42-22.

**B.      The new entities are subject to successor liability because they share substantial continuity with the old entities, they had constructive notice of the old SMI's withdrawal liability, and imposing successor liability is fair.**

The Trust seeks a summary-judgment ruling on the new entities' liability for the MPPAA withdrawal liability of the old SMI under the doctrine of successor liability.[44]  The new entities argue that summary judgment is unavailable because there are genuine factual disputes concerning their "status as a successor" and they never received proper notice from the Trust.[45]

### 1.      *There is no genuine dispute that there is substantial continuity between the old and new entities*.

"In order for an asset purchaser to incur withdrawal liability, it must (1) be a successor and (2) have notice of the withdrawal liability."[46]  When evaluating successorship, the "primary question . . . is whether, under the totality of the circumstances, there is 'substantial continuity' between the old and new enterprise."[47]  The Ninth Circuit has recognized a non-exhaustive list of successorship factors:

> Whether there has been a substantial continuity of the same business operations; whether the new employer uses the same plant; whether the same or substantially the same work force is employed; whether the same jobs exist under the same working conditions; whether the same supervisors are employed; whether the same machinery, equipment, and methods of production are used; and whether the same product is manufactured or the same service is offered.[48]

---

[44] ECF No. 42 at 5.

[45] ECF No. 58 at 3–4.

[46] *Heavenly Hana LLC*, 891 F.3d at 844 (cleaned up).

[47] *Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1095 (9th Cir. 2015).

[48] *Id.* at 1090–91 (cleaned up).

The circuit has also recognized that the new business deliberately taking over the same body of customers is particularly important because "focusing the successorship inquiry on business retention through exploitation of the predecessor's contacts, public presentation, and good will effectuates the purposes of the MPPAA construction industry withdrawal provisions."[49]  The successorship test is "more functional than formal," so "the absence of one factor does not compel a particular conclusion."[50]

The Trust argues that the new entities operate as essentially identical businesses to their predecessors because they use the same names, performed the same work in the same region, kept many of the same clients, and retained all of the old Sentinel Maintenance's employees.[51]  The new entities retort that this is far from the truth, claiming that their customer overlap with the old entities "show[s] nothing" and that only one of the new Sentinel Maintenance's employees had also worked for the old SMI.[52]  The new entities add that the new SMI demonstrated intent to be bound by the CBA, but the new Sentinel Maintenance did not.[53]

### a.    *The doctrine of issue preclusion bars the new entities from differentiating themselves for purposes of successor liability.*

The new entities' effort to differentiate the new Sentinel Maintenance and the new SMI for purposes of successor liability is unavailing.  They argue that the fact that they "made contributions and submitted certificates" doesn't support successor liability because "only SMI

---

[49] *Id.* at 1096.

[50] *Id.* at 1091 (cleaned up).

[51] ECF No. 42 at 18–19.

[52] ECF No. 58 at 12–13.

[53] *Id.* at 13–14.

manifested an intent to be bound by the CBA."[54]  But the new Sentinel Maintenance and the new

SMI have already been found to be alter egos.[55]  That relationship—as decided by a final

judgment on the merits—is established as a matter of law under the doctrine of issue

preclusion.[56]

### b.   Applying the Ninth Circuit's successorship factors indicates that there was substantial continuity between the old and new entities.

As for the successorship factors, the new entities purchased "every conceivable" asset of

their predecessors, which expressly included the right to use the trade names "Sentinel

Maintenance of Las Vegas" and "SMI, LLC," and all telephone numbers, domain names, and

social-media accounts belonging to the old entities.[57]  Plus, the terms of sale for both businesses

covered the goodwill of the businesses, including any goodwill associated with the business

names.[58]  Greco testified at deposition that this asset acquisition included equipment, vans, and

employees.[59]  And Grotzky confirmed in his deposition that the old entities sold "naming rights"

to the new ones.[60]  There was also substantial continuity of business operations—the old entities

---

[54] *Id.* at 13.

[55] ECF No. 42-19 at 11–13.

[56] *See Paolo v. Holder*, 669 F.3d 911, 917 (9th Cir. 2011) ("Issue preclusion . . . applies when: (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom issue preclusion is asserted was a party or in privity with a party at the first proceeding.") (cleaned up).

[57] ECF No. 42-11 at 2–3; ECF No. 42-12 at 2–3.

[58] ECF No. 42-11 at 3; ECF No. 42-12 at 3.

[59] ECF No. 42-14 at 12:14 (May 24, 2023, deposition of Greco).

[60] ECF No. 42-5 at 19:20–24.

did window washing and construction cleaning in the Las Vegas area;[61] the new entities did

window washing and "window maintenance" in the Las Vegas area.[62]

### i.    *The work-force factor weighs in favor of successor liability.*

The Ninth Circuit's successorship factors include whether "the same or substantially the

same work force" is employed by the new business.[63]  Limor Caspi, Sentinel Maintenance's

former office manager, testified at deposition that she was familiar with the employees of the old

Sentinel Maintenance and that the new Sentinel Maintenance used the same employees.[64]  The

new SMI had no employees.[65]  Caspi herself was a form of continuity between the old and new

entities—remittance forms submitted to the union show that she was the office manager before

and after Greco and Schultz acquired the companies.[66]  And Caspi's testimony confirmed she

"performed similar services" for the old and new entities.[67]

The new entities largely sidestep this issue of overlap between the old and new Sentinel

Maintenance's employees, instead discussing only one employee—Marvin Membreno-Funes,

who had previously worked for the old SMI.  They admit to having rehired Membreno-Funes,[68]

and Caspi confirms that he was employed as a window washer by the new Sentinel

Maintenance.[69]  But the new entities insist that Greco and Schultz didn't intend for the new

---

[61] ECF No. 42-13 at 35:20–36:1 (Sept. 17, 2024, deposition of Greco); ECF No. 42-8 at 24:1–12.

[62] ECF No. 42-13 at 47:4–10; 53:23–54:4.

[63] *Michael's Floor Covering, Inc.*, 801 F.3d at 1090.

[64] ECF No. 42-8 at 34:22–35:2.

[65] *Id.* at 35:3–4.

[66] *See* ECF Nos. 42-9, 42-20.

[67] ECF No. 42-8 at 34:4–7.

[68] ECF No. 58 at 6–7, ¶ 12.

[69] ECF No. 42-8 at 75:5–13.

1  Sentinel Maintenance to hire any employees of the old SMI and that Membreno-Funes "was not

2  hired as a continuation of any employment relationship he may have had with [the old] SMI."[70]

3  Although no party discusses it, there seems to be a second worker employed by both the old SMI

4  and New Sentinel: Pedro Ortega is listed as an employee by the old SMI's remittance reports and

5  in the new entities' February 2020 report.[71]

### ii.    The new entities exploited the old entities' business names and existing customer base.

8  The Ninth Circuit has determined that an MPPAA withdrawal-liability successorship

9  analysis should focus on "business retention through exploitation of the predecessor's contacts,

10 public presentation, and good."[72]  The assets that Greco and Schultz purchased expressly

11 included customer contracts that weren't completed by the old entities before closing.[73]  These

12 included contracts with Christian Dior, LM Construction Co., MGM Total, Opportunity Village

13 Association, Station Casinos LLC, United Construction, and the Waldorf Astoria Las Vegas,

14 which Caspi identified as clients shared between the old and new Sentinel Maintenance.[74]  The

15 asset-purchase agreements also covered the right to use the names of the old businesses, take

16 over their social-media accounts and phone numbers, and to profit from their existing goodwill.[75]

17 Caspi's testimony confirms that the old and new Sentinel Maintenance shared a plethora

18 of customers, identifying "Christian Dior, G2 Capital, Grat[o]n, Guerlain, LM, Martin-Harris,

---

20  [70] ECF No. 58 at 6–7, ¶ 12.

21  [71] ECF No. 42-9 at 3, 5; ECF No. 42-20 at 16.

    [72] *Michael's Floor Covering, Inc.*, 801 F.3d at 1096.

22  [73] ECF No. 42-14 at 85–86.

23  [74] *Id.* at 86, 158–160.

    [75] ECF No. 42-11 at 2–3; ECF No. 42-12 at 2–3.

MGM, Opportunity Village, SR Construction, Station Casino, Sunset Station, Ted Baker, Tim Keener, United Construction and Waldorf Astoria," plus "Green Valley," "the Smith," and "Trump" as some of the overlapping clients.[76]  As the sales-by-customer list that Caspi referred to when identifying the overlapping clients shows, the new Sentinel Maintenance provided primarily window-cleaning services to these customers.[77]  As for union work, the record indicates that both of the new SMI's clients, Tutor Perini and McCarthy, had been clients of the old SMI.[78]  This significant client overlap, combined with the asset-purchase terms allowing the new entities to essentially assume the identity of the old ones, supports a finding of successor liability.

### iii.  The new entities' act of continuing to submit remittance reports is further evidence of substantial continuity.

The Trust stresses that "the New Sentinel Entities submitted remittance reports to the Pension Trust" and argues that this is unequivocal evidence that New Sentinel was a successor.[79] The Trust provides remittance reports submitted by the old SMI and the new Sentinel Maintenance from October 2018 until January 2022 and contributions made by the new entities.[80]  The remittance reports from the old SMI range from October 2018 to May 2019, are

---

[76] ECF No. 42-8 at 71:11–14; 71:24–72:14.

[77] *Id.* at 208 (Jan. to Dec. 2019 sales by customer summary for Sentinel Maintenance).

[78] ECF No. 42-5 at 117:19–118:8 (Grotzky specified in this testimony that he did "unionized work" for a predecessor of Tutor-Perini); ECF No. 42-8 at 72:15–22; ECF No. 42-13 at 43:21–25; ECF No. 42-17; ECF No. 42-18.

[79] ECF No. 42 at 19–20.

[80] ECF Nos. 42-9, 42-20, 42-21.

all submitted by Caspi, and calculate contributions owed and name employees.[81]    The remittance

reports for the new entities were also submitted by Caspi until September 2020.[82]

> iv.    **The District of Hawaii's analogous reasoning in a recent case illustrates that applying successor liability to the new entities is appropriate.**

The District of Hawaii's summary-judgment order in *Board of Trustees of the PAMCAH-UA Local 675 Pension Fund v. SMAC Hawaii, Inc.* persuasively applies the Ninth Circuit successor-liability factors to a similar scenario.[83]    In that case, the court found on summary judgment that the non-union air-conditioning company R&M Air Conditioning, LLC was a successor of SMAC Hawaii, LLC, a defunct air-conditioning company.[84]    Despite the businesses' different names and the fact that SMAC was a union shop and R&M was non-union, "SMAC and R&M provided nearly identical services in the same geographical location . . . They had the same phone number . . . They used the same office equipment, machinery, and cars."[85] The court found it particularly important that R&M had the "same business functions" as its predecessor—both provided "sheet metal and air conditioning services."    And acknowledging that "the most important factor for the court to consider is the overlap in customers," the court found that evidence of "the precise share of work" that R&M took over from SMAC was unnecessary because it undisputedly provided similar services to enough repeat customers that it

---

[81] *See* ECF No. 42-9 (old SMI remittance reports and payments).

[82] *See* ECF No. 42-20.

[83] *Bd. of Trs. of the PAMCAH-UA Local 675 Pension Fund v. SMAC Haw., Inc.*, 2025 WL 2021750 (D. Haw. July 18, 2025).

[84] *See id.*

[85] *Id.* at *10.

14

was "clear that this overlap in customers [was] not accidental."[86] "R&M took up shop where SMAC left off: it share[d] the same phone number, core employees, and SMAC's goodwill."[87]

The same can fairly be said of the new entities. They did similar work, in the same city, and with the same office manager. They also employed substantially similar employees and provided services for many of the same clients—so many that accidental overlap is highly unlikely. And while R&M took on a new name, the new entities kept the same two business names as their predecessors: Sentinel Maintenance for non-union work and SMI for union jobs. Even construed in the light most favorable to the new entities, this evidence shows substantial continuity. So I find that the new entities are successors to the old entities.

### 2. The new entities had sufficient notice to be held liable for the old SMI's withdrawal liability.

The Ninth Circuit has determined that "a bona fide successor can be liable for its predecessor's MPPAA withdrawal liability . . . so long as the successor had notice of the liability."[88] The new entities acknowledge that it "may have been on constructive notice of withdrawal liability" but insists that it didn't have constructive notice that the Trust "had served a demand under Section 1399 on Old SMI."[89] They insist that the Trust is trying to "turn Section 1399's remedial scheme on its head"[90] by "deliberately" depriving them of notice and thus the opportunity to seek arbitration.[91] The new entities support this theory by stressing that the Trust

---

[86] *Id.* at *11.

[87] *Id.*

[88] *Michael's Floor Covering, Inc.*, 801 F.3d at 1095.

[89] ECF No. 58 at 12.

[90] *Id.* at 9.

[91] ECF No. 58 at 2.

sent notice of withdrawal only to the old SMI, despite having already sued the new entities and thus obviously having knowledge of their existence.[92]  The Trust responds that constructive rather than actual notice is the relevant standard and that it has been met.[93]  It adds that, even though actual notice is not required, contemporaneous emails show that the new entities did, in fact, receive actual notice of the potential withdrawal liability.[94]

Indeed, constructive notice of a predecessor's liability is all that's required.  In *Heavenly Hana LLC v. Hotel Union & Hotel Industry of Hawaii Pension Plan*, the Ninth Circuit held that "a company must assume the unpaid withdrawal liability of its predecessor to a multiemployer pension plan if it was on constructive notice of potential withdrawal liability."[95]  In the context of successor liability for multiemployer pension plan withdrawal, the constructive-notice standard is met when (1) the asset purchaser qualifies as a successor; "(2) the relevant pension plan is underfunded; and (3) a purchaser using reasonable care or diligence would have discovered the withdrawal liability."[96]  The only element left to resolve is the third—I have already found that the new entities are successors of the old entities and the underfunding of the plan is not disputed by the parties.

"Under a constructive-notice standard, purchasers are deemed to have notice of any facts that one using reasonable care or diligence should have."[97]  The *Heavenly Hana* panel found that

---

[92] *Id.*

[93] ECF No. 63 at 10.

[94] *Id.* at 11.

[95] *Heavenly Hana*, 891 F.3d at 842.

[96] *Id.* at 847.

[97] *Id.* at 845 (cleaned up).

this standard for successor liability is consistent with "the MPPAA's intended purpose."[98]  And it reasoned that constructive notice would not create a strict-liability standard for asset purchases because successor liability only exists if the three prongs of constructive notice are met and it would be fair to impose such liability.[99]  The Ninth Circuit hasn't held that a successor must have notice of potential withdrawal liability before purchasing a business; rather, it held in *Resilient Floor Covering Pension Trust Fund Board of Trustees v. Michael's Floor Covering, Inc.* that "the notice requirement may be satisfied if a successor 'is able to consider' information about the liability 'before deciding to continue the predecessor's business.'"[100]

The new entities would have discovered the withdrawal liability with reasonable care or diligence.  As the Ninth Circuit has articulated, "when an employer sells its assets and withdraws from the pension plan, it ordinarily incurs liability for a complete withdrawal."[101]  Despite now arguing that they were kept in the dark about their predecessors' withdrawal liability, the new entities made monthly contributions and remittance reports to the union.[102]  The record does not support the new entities' claim that they lacked constructive notice when their actions demonstrate knowledge of an ongoing obligation to the Trust.  To be sure, the new entities weren't blindly contributing money to and filing remittance reports with the union for charity.  Rather, as Schultz testified, these payments were motivated by "what was known" about the old SMI and wanting to "[make] sure it's all paid right."[103]

---

[98] *Id.*

[99] *Id.*

[100] *Resilient Floor Covering Pension Fund v. TD Sports Group, LLC*, 2025 WL 452511, at *8 (N.D. Cal. Feb. 6, 2025) (quoting *Michael's Floor Covering, Inc.*, 801 F.3d at 1093).

[101] *GCIU-Emp. Ret. Fund v. MNG Enters.*, 51 F.4th 1092, 1095 (9th Cir. 2022) (cleaned up).

[102] ECF Nos. 42-20, 42-21.

[103] ECF No. 42-15 at 44:15–22 (Schultz deposition).

The new entities' argument that notice was nevertheless insufficient impermissibly conflates the notice requirements for withdrawal liability and successor liability. As another district court articulated, "there is a distinction between the general requirement that an employer be issued notice of its withdrawal liability under 29 U.S.C. § 1399(b), and the requirement under the test for successor liability that a successor has notice of the predecessor's potential or actual withdrawal liability before taking over the business."[104] Even if the new entities lacked actual notice of the old SMI's withdrawal liability, which their September 2022 email exchange with the Trust suggests was not the case,[105] their consistent contributions and reports to the union indicate that they had knowledge of the union relationship and thus could have discovered the liability with reasonable care and diligence. And that is all that's necessary.[106] The new entities got the notice that the law requires them to receive.

### 3. Subjecting the new entities to successor liability is not unfair.

Fairness is the final hurdle that the Trust must clear to garner summary judgment on its successor-liability claim. The *Heavenly Hana* panel held that successor liability can "only be imposed when it is fair to do so."[107] "Because the origins of successor liability are equitable, fairness is a prime consideration in its application."[108] This entails "analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation [that] is at issue, whether it be the duty to recognize

---

[104] *Bd. of Trs. Sheet Metal Workers Nat'l Pension Fund v. Epic Sheet Metal Inc.*, 2024 WL 5410978, at *10 (C.D. Cal. Nov. 5, 2024) (cleaned up).

[105] ECF Nos. 63-2, 63-3. The Trust's letter is attached to Gerken's email, clearly establishing receipt. ECF No. 63-2 at 3.

[106] *Heavenly Hana LLC*, 891 F.3d at 847.

[107] *Id.*

[108] *Criswell v. Delta Airlines*, 868 F.2d 1093, 1094 (9th Cir. 1989).

and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc."[109]  "Courts have indicated that because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans."[110]

Imposing successor liability on the new entities protects the participants in the plan.  The new entities purchased "every conceivable" asset of the old entities, including the right to use their business names and benefit from their existing goodwill.[111]  It is fair that the benefits of successorship be accompanied by the drawbacks.  In this case, the application of successor liability would promote the MPPAA's objective of "protect[ing] the financial solvency of multiemployer pension plans,"[112] and the record doesn't impede liberally construing the statute in favor of employee-benefit-plan participants.  So I find that this final fairness question is satisfied and that the new entities are subject to successor liability for the old SMI's withdrawal liability.

**C.    The total amount due is $1,288,521.04.**

The new entities argue that a fact-finding hearing to determine the amount due is appropriate where, as here, "a judgment cannot be liquidated to an exact amount."[113]  But here there is an established withdrawal liability amount that was not challenged by the withdrawing employer before the statutory deadline, and the interest rate and liquidated damages are

---

[109] *Michael's Floor Covering, Inc.*, 801 F.3d at 1093.

[110] *Heavenly Hana*, 891 F.3d at 845.

[111] *See* ECF Nos. 42-11, 42-12.

[112] *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 (1997).

[113] ECF No. 58 at 15.

predetermined by documents like the applicable pension-trust agreement.  So the amount due in this matter can, in fact, be precisely calculated.

The Trust sent a letter demanding payment to the old SMI on October 6, 2022; the letter calculated the old SMI's withdrawal liability as $842,888 in total.[114]  The demand letter requested 14 payments of $63,251 and one final payment of $38,842.[115]  The Trust and the new entities apparently agree that the old SMI didn't challenge this liability assessment before the statutory deadline and never made a payment.[116]  The Trust then sent a notice of default to the old SMI on February 28, 2023.[117]  The Trust's governing documents provide that the interest rate is set to accrue at a rate of 14% per year.[118]

The Trust demands a total of $1,329,105.14 in damages, comprised of $842,888 in withdrawal liability, $243,108.57 in interest, and $243,108.57 in liquidated damages.[119]  But the interest factored into that final sum is calculated based on an "anticipated date of entry of judgment" that does not match the date of this order.[120]  And the liquidated damages demanded are based on that interest calculation.[121]

The Trust computes the interest owed for the first and second missed payments from their respective due dates until the date of default, and for the full withdrawal liability amount from

---

[114] ECF No. 42-22 at 2.

[115] *Id.*

[116] ECF No. 42 at 4; ECF 58 at 2, 10.

[117] ECF No. 42-24.

[118] ECF No. 42-2 at 7, § III.5 (Pension Trust Agreement); ECF No. 42-25 at 3, § III.B (the Trust's collection policy).

[119] ECF No. 42 at 26.

[120] *Id.*

[121] *Id.*

the date of default.[122]  The interest calculations for the first two payments—$4,342.66 and $2,110.68—are accurate but the interest for the total liability amount must be updated to reflect the publication date of this order.  Based on the 837 days that have elapsed from the date of default, the interest accrued since the date of default is $270,602.10.[123]  So the total interest accrued is $277,055.44.

The Trust's collection policy provides that liquidated damages will be "20% of the amount of unpaid contributions, or equal to the interest due at the trust rate, whichever is higher."[124]  29 U.S.C. § 1132(g)(2)(C)(ii) instructs courts to award liquidated damages provided for under an employee benefit plan, but cautions that these damages cannot exceed 20% of the unpaid contributions unless state or federal law allows for a higher percentage.  Section 1132(g)(2)(C)(ii) applies when "(1) the fiduciary obtains a judgment in favor of the plan; (2) unpaid contributions exist at the time of suit; and (3) the plan provides for liquidated damages."[125]  These factors are met, but the Trust doesn't identify any state or federal law allowing it to collect liquidated damages at a rate higher than 20%.[126]  So with an interest amount greater than one-fifth of the delinquent contributions, the 20% formula must apply.[127]

---

[122] ECF No. 42 at 25–26.

[123] 14% of 842,888 is 118,004.32, meaning that $118,004.32 in interest accrues each year. That's $323.30 per day.  $323.30 accruing each day for 837 days leads to $270,602.10 owed in interest.

[124] ECF No. 42-25 at 3, § III.B (cleaned up).  *See also* ECF No. 42-2 at 36.

[125] *Idaho Plumbers & Pipefitters Health & Welfare Fund v. United Mech. Contractors, Inc.*, 875 F.2d 212, 215 (9th Cir. 1989) (cleaned up).

[126] *See* ECF No. 42 at 26 (incorrectly stating that § 1132(g)(2)(C)(ii) allows for liquidated damages equal to 20% of the missed contributions or the interest due, "whichever is higher").

[127] The total interest due is $270,602.10, while 20% of the delinquent contributions would be $168,577.60.

21

The liquidated damages owed are thus $168,577.60.[128]  So the total amount due is $1,288,521.04—$842,888 in withdrawal liability, $277,055.44 in interest, and $168,577.60 in liquidated damages.

**Conclusion**

IT IS THEREFORE ORDERED that the plaintiffs' motion for summary judgment **[ECF No. 42] is GRANTED.**  Sentinel Maintenance of Las Vegas, LLC and SMI, LLC are subject to **successor liability in the amount of $1,288,521.04 through August 13, 2025.**

This order grants summary judgment on just one claim: the plaintiff's second claim for successor-withdrawal liability against the new entities.  No party has addressed what impact such a ruling has on the plaintiff's first claim for relief (withdrawal liability against the old entities) or any crossclaim by or between the defendants.  So the court does not enter final judgment or partial final judgment at this time.  **All parties must appear for a status conference** concerning the status of any remaining claims in Courtroom 6D of the Lloyd D. George U.S. Courthouse **on August 26, 2025, at 1:30 p.m.**

_____
U.S. District Judge Jennifer A. Dorsey
August 13, 2025

---

[128] 842,888 x .2 = 168,577.6.